IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MATTHEW A. GIROUX, | ) |
| Plaintiff, | ) |
| v. | ) Civil No. 11-124-GPM-CJP |
| MICHAEL J. ASTRUE,<br>**Commissioner of Social Security,** | ) |
| Defendant. | ) |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Matthew A. Giroux seeks judicial review of the final agency decision finding that he is not disabled and denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.

## Procedural History

Plaintiff filed an application for DIB and SSI in February, 2009, alleging disability beginning on April 28, 2007.[1] The application was denied initially and on reconsideration. At plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) Alvaro Garza. ALJ Garza denied the application for benefits in a decision dated February 5, 2010. (Tr. 12-19). Plaintiff's request for review was denied by the Appeals Council, and the February 5, 2010,

---

[1]The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

-1-

decision became the final agency decision. (Tr. 1-5).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises three issues:

(1) Whether the ALJ erred in assessing plaintiff's credibility;

(2) Whether the ALJ erred in analyzing the effects of his obesity; and

(3) Whether the ALJ erred in finding that he was capable of performing semi-skilled jobs.

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.** **The Decision of the ALJ**

Mr. Giroux was 37 years old at the time of the ALJ's decision, and had a GED  The ALJ found that he had severe impairments of hernia, status post multiple surgical interventions, hypertension, and obesity, and that his condition did not meet or equal a listed impairment. The ALJ found that plaintiff had the residual functional capacity (RFC) to perform sedentary work, with no climbing of ladders, ropes or scaffolds. This RFC rendered him unable to perform his past work of pest inspector/exterminator, tooler, trainer/job coach, and security person. Based upon the testimony of a vocational expert, the ALJ found that plaintiff could perform the jobs of cashier, sorter, and appointment scheduler. Thus, the ALJ concluded that he was not disabled. (Tr. 12-19).

**2.** **Evidentiary Hearing**

The evidentiary hearing took place on February 1, 2010. Plaintiff was represented at the hearing by attorney Chris Gore. (Tr. 25).

Plaintiff was 37 years old and had a GED (Tr. 26). He testified that he was disabled due to four hernia surgeries. (Tr. 28). He was 5' 9" tall and weighed about 270 pounds. (Tr. 30). He said that he could not sit or stand for very long. (Tr. 29). He can lift a gallon of milk and pick up small objects. (Tr. 31). He can lift his hands over his head, but only for a short time because it stretches his stomach. He can't bend and stretch, so his fiancee must help him bathe and dress. (Tr. 31).

On a typical day, Mr. Giroux sits in a chair next to his bed and watches movies. He goes back to bed due to pain in his stomach from the hernia, and spends 3 or 4 hours out of the day laying down. His fiancee makes his meals. (Tr. 32-33). He testified that his fiancee does everything around the house, and he is unable to do anything. He cannot "even go pet [his] dogs." (Tr. 35). He leaves the house maybe once a month. (Tr. 36).

Plaintiff takes Diovan for blood pressure, Pepcid for heartburn, and Percocet for pain. (Tr. 37).

Mr. Giroux testified that he was able to sit for 3 hours at a time, and, if he laid down for 2 hours, he could sit for another 3 hours. (Tr. 38).

Dr. Dorothy Leong testified as an independent medical expert, "credited with knowing the rules of disability."[2] (Tr. 40). Her testimony was based on a review of the medical records. (Tr. 41-42). Dr. Leong testified that there was no indication that plaintiff's blood pressure had caused organ damage, and that his impairments did not meet or equal a listed impairment. (Tr. 42). She opined that he had the ability to lift 5 pounds frequently and 10 pounds occasionally,

---

[2]Dr. Leong's c.v. is at Tr. 121. Her name was misspelled as "Lionne" in the hearing transcript.

and to sit, stand and walk at least 6 out of 8 hours. He could frequently balance, stoop, kneel, crouch, and crawl, but could not climb ladders, ropes or scaffolds. He had no manipulative, visual, communicative or environmental limitations. (Tr. 43).

Ronald Malik testified as a vocational expert.[3] The VE testified that plaintiff's past work as a pest inspector was light to medium and skilled. His work as a parts tooler was medium and semi-skilled. His work as a trainer was heavy and skilled, and his work in security was light and semi-skilled. (Tr. 46-47).

Asked to assume a person of plaintiff's age and vocational history who could do a full range of sedentary work, the VE testified that plaintiff could perform the jobs of cashier, sorter, and appointment scheduler, all of which exist in significant numbers in the national economy.[4] These jobs are all semi-skilled. The VE testified that plaintiff could do semi-skilled work because he had held jobs at the skilled level, which "would require some of the same clerical skills." (Tr. 47-48).

**3.    Medical Records**

Mr. Giroux was seen by Dr. Resaba of Franklin Hospital Healthcare Clinic on January 9, 2007. He told Dr. Resaba that he had been scheduled to have his hernia repaired by a Dr. Miller on December 12, 2006, but Dr. Miller cancelled the surgery because Mr. Giroux had drunk "a lot" of alcohol the previous night. Mr. Giroux indicated that he wanted to see Dr. Suwana for his hernia. (Tr. 207). A sonogram showed a 4 centimeter ventral hernia and fatty infiltration of the liver. (Tr. 444).

About a week later, Dr. Mehta Suwana performed a surgical repair of a ventral hernia at

---

[3]Mr. Malik's c.v. is at Tr. 110. His name was misspelled as "Maddock" in the hearing transcript.

[4]The nonexertional limitations found by the ALJ (no climbing of ladders, ropes or scaffolds) do not significantly reduce the range of sedentary jobs. SSR 83-14, at *2.

-4-

Herrin Hospital in Herrin, Illinois. The hernia had been present for over 2 years. Dr. Suwana noted that, aside from hypertension, he was healthy. He weighed 228 pounds. Dr. Suwana informed plaintiff that excessive weight gain following surgery could cause a recurrence. (Tr. 255-257).

On June 17, 2007, plaintiff went to the emergency room at Franklin Hospital in Benton, Illinois, complaining of nausea, vomiting, and abdominal pain for 4 days. Blood testing was positive for alcohol. He was given medications via i.v., and discharged. The diagnosis was alcoholic gastritis. He was advised to stop using alcohol. (Tr. 265-270).

Plaintiff returned to the emergency room at Franklin Hospital on January 7, 2008, complaining of abdominal pain and vomiting. He had a large hernia. He was transferred to Herrin Hospital. (Tr. 275-284). Dr. Suwana saw him at Herrin, and determined that he had a ventral hernia above the umbilicus which could not be reduced. Dr. Suwana noted that Mr. Giroux was known to be a tobacco and alcohol abuser, but he claimed he had not used much alcohol recently. He did not know if his blood pressure was high as he had not seen his doctor in a while. His weight was 222 pounds. (Tr. 234-235). The next day, Dr. Suwana performed a surgical repair of the hernia. (Tr. 246). The discharge summary states that Dr. Suwana did a repair with graft, and surgery went well. He was discharged the next day with a drain in place. He was to return in a few days for removal of the drain "due to patient's poor personal and home hygiene." He was told to avoid "heavy activity" for 6 weeks and to walk 3 times a day. (Tr. 230-231).

In April, 2008, Dr. Suwana did a surgical repair of epigastric and umbilical hernias. Following the surgery, he was told to keep his wound dry and clean, avoid heavy activity for 6 weeks, and avoid driving for one week. (Tr. 212-213).

On May 18, 2008, plaintiff went to the emergency room at Franklin Hospital,

complaining of abdominal pain from his surgery. His abdomen was distended. An abdominal x-ray showed no acute disease. He was administered medications and discharged to home in improved condition. (285-296).

The record reflects no treatment from May 18, 2008, through April 13, 2009, when Dr. Adrian Feinerman performed a consultative evaluation of plaintiff. Plaintiff gave a history of 3 "unsuccessful attempts" to repair an abdominal hernia. He also said he had hypertension without end organ damage. He was no longer taking blood pressure medication. On the day of the exam, his blood pressure was 200/120, and Dr. Feinerman told him he should call his doctor about this. He weighed 243 pounds. His abdomen was soft and non-tender. He had full range of motion of his arms and legs. Grip strength was strong and equal bilaterally. Fine and gross manipulation were normal. He had full range of motion of his spine. Ambulation was normal without an assistive device. He could walk 50 feet. He could get on and off the examining table. He had no pain in his weight-bearing joints. Muscle strength was normal throughout. He was able to tandem walk, walk on heels and toes, hop, squat, and rise from a chair without difficulty. Fine and gross manipulation were normal. He had no muscle spasm or atrophy. Sensory examination and deep tendon reflexes were normal. Dr. Feinerman noted that he was able to sit, stand, walk, hear and speak normally, and he could lift, carry and handle objects without difficulty. (Tr. 298-302).

On April 22, 2009, state agency physician Ernest Bone, M.D, completed a physical RFC assessment in which he indicated that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, sit/stand/walk for 6 out of 8 hours, and had unlimited push/pull ability. He assessed no other limitations. (Tr. 306-313).

Mr. Giroux saw Dr. Resaba on August 14, 2009, to get "disability papers" completed. He told Dr. Resaba that he was unable to work or lift. He was trying to get a medical card. He

said that he thought his intestines were twisted, and he had abdominal pain with an occasional ripping sensation. On examination, he had tenderness and scar tissue in his abdomen. He was noted to have protruding abdominal hernia and umbilical hernias. (Tr. 448-449).

A CT scan on August 14, 2009, showed kidney and bladder calcifications and a periumbilical ventral abdominal wall hernia. (Tr. 447). On August 17, 2009, plaintiff was seen by Dr. Resaba. The note indicates that Mr. Giroux used to work at a boat factory off and on, and that he quit working after his third surgery. (Tr. 450). Dr. Resaba referred him to a urologist. He said that he had no insurance or medical card. Dr. Resaba advised him to stop smoking. (Tr. 451).

Mr. Giroux returned to Dr. Resaba on November 12, 2009, complaining of chest congestion with colored phlegm. His blood pressure was 144/90. He said he had not been taking medication because he could not afford it. He had an abdominal hernia and kidney stones. (Tr. 452). He was noted to be obese. Dr. Resaba prescribed an antibiotic and blood pressure medication, and advised plaintiff to stop smoking and drinking. (Tr. 453). On November 24, 2009, plaintiff returned for a recheck. He had "no acute complaints." (Tr. 455). Dr. Resaba noted that his blood pressure was improved. (Tr. 454).

Mr. Giroux then came under the care of Dr. Judson Brewer, who repaired his recurrent incisional hernia at Memorial Hospital in Carbondale, Illinois, in December, 2009. By that time, plaintiff has succeeded in getting Medicaid coverage. (Tr. 318). His first visit with Dr. Brewer was on November 25, 2009. Dr. Brewer noted that he had been referred by Dr. Resaba, and that he had an incisional hernia for the past 6 months. His symptoms were aggravated by lifting weight, and he said he was in a lot of pain and could not bend over. (Tr. 346). On physical examination, Dr. Brewer noted that he was not in acute distress, and he was obese. He had a large hernia at the incisional area, which was reducible. Dr. Brewer determined that he needed

an open hernia repair with mesh. (Tr. 347-348). He was seen at the hospital for pre-operative testing on December 4, 2009. (Tr. 317). It was noted that he was taking Diovan for his blood pressure, Pepcid, and ibuprofen. (Tr. 324). He weighed about 262 pounds. (Tr. 340). Dr. Brewer diagnosed recurrent incisional hernias, and performed surgery on December 7, 2009, to repair the hernia. During the surgery, he removed the mesh that had been placed in the previous surgery, placed new mesh, and made relaxing incisions to reduce the tension on the repair. (Tr. 334, 353).

On discharge, plaintiff was instructed to limit his use of stairs and to avoid lifting more than 10 pounds for 6 weeks. He was not to drive until further notice. He was given a follow-up appointment with Dr. Brewer for December 15, 2009. (Tr. 425). There is no indication in the records that Mr. Giroux kept this appointment.

## **Applicable Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

-8-

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** ***Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether Mr. Giroux is, in fact, disabled, but whether ALJ Garza's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**

In reviewing for substantial evidence, this Court uses the Supreme Court's definition, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  Further, the entire administrative record is taken into consideration, but this court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).**  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited**

**therein.**

## Analysis

Here, the ALJ properly followed the five step analysis. He concluded that plaintiff does have severe impairments of hernia, status post multiple surgical interventions, hypertension, and obesity, and that these impairments do not meet or equal a listed impairment. Mr. Giroux does not challenge the finding that his condition does not meet or equal a listed impairment.

Plaintiff's first point is that the ALJ erred in assessing his credibility in that he did not consider the factors set forth in SSR 96-7p.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." ***Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein**.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.[5]

Contrary to plaintiff's argument, the ALJ did, in fact, consider the relevant factors. ALJ

---

[5]Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." ***Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999)**. Social Security Rulings are "binding on all components of the Social Security Administration." **20 C.F.R. § 402.35(b)(1)**. They do not, however, "have the force of law or properly promulgated notice and comment regulations." ***Lauer, id.***

Garza discussed plaintiff's credibility at Tr. 15-17. The ALJ found it significant that the degree of pain claimed by plaintiff was not supported by the objective medical evidence. Also, when Dr. Feinerman examined plaintiff, he found no significant functional limitations. The medical evidence did not demonstrate "progressive deterioration," which would be expected if plaintiff's pain were at the level that he claimed. In addition, the ALJ felt that Mr. Giroux had demonstrated "chronic medical non-compliance" in that he ignored his doctors' instructions to stop smoking, stop drinking, lose weight and exercise.

Plaintiff's only specific argument is that his credibility is enhanced by the fact that he took Percocet for pain relief. The use of pain medication is one of the relevant factors. However, it is only one of many. The ALJ noted that plaintiff did not have "much in terms of medication management." (Tr. 17). Percocet was prescribed when plaintiff was discharged from the hospital after his last surgery. However, he was also told to return to Dr. Brewer on December 15, 2009. (Tr. 422-425). There is no indication in the medical records that plaintiff kept that appointment and no indication that any doctor recommended that he continue to use Percocet indefinitely. The fact that Mr. Giroux was prescribed Percocet in the recovery period from his last surgery does not compel a finding that he continued to suffer disabling pain at the time of the hearing.

In short, the ALJ considered the relevant factors. The fact that he did not weigh the factors the way plaintiff would like does not mean that his credibility determination was legally insufficient. Plaintiff has not demonstrated any error with regard to the credibility findings. As the ALJ's credibility findings were not "patently wrong," they should not be overturned. **Powers v. Apfel**, 207 F.3d 431, 435 (7th Cir. 2000).

Plaintiff also argues that the ALJ failed to adequately consider limitations caused by his obesity.

The ALJ stated that obesity cannot be considered as a separate impairment, but the effects of obesity must be considered along with the plaintiff's other impairments. (Tr. 15). This is correct. See, SSR 00-3p (Titles II and XVI: Evaluation of Obesity).

The ALJ did, in fact, consider plaintiff's obesity. Plaintiff cites to SSR 02-1p, which says that a claimant with obesity "may" have certain problems. However, he points to no evidence in the record to indicate that his obesity causes him any limitations in addition to the limitations that were assigned by the ALJ. The only limitation suggested by plaintiff is that he testified that he has to lay down several times a day. Doc. 18, pp. 6-7. This argument is undercut by plaintiff's own testimony in that he said that he has to lay down because of pain, and not for any reason associated with his weight. (Tr. 38). There is simply no evidence in the record to indicate that plaintiff's obesity makes him unable to do sedentary work.

Lastly, plaintiff complains that the ALJ erred in finding that he could do work which exists in the economy because the jobs identified by the VE are semi-skilled, but he has no transferrable skills.

The Court first notes that plaintiff's brief erroneously states that the ALJ found that he could do the jobs of pest inspector, tooler, trainer/job coach and security person. This is incorrect. The ALJ did not find that he could do these jobs. These are plaintiff's past jobs. The ALJ found that he is unable to perform any of his past relevant work. See, Tr. 17.

Plaintiff's argument is completely baseless in view of the VE's testimony that plaintiff does, in fact, have transferrable clerical skills. (Tr. 48). Further, because of his relatively young age, the ALJ correctly found that transferability of job skills is not an issue. (Tr. 18). A younger person is deemed to have the ability to make the adjustment to other work. Rules 201.27 through 201.29 of the "medical-vocational guidelines" (20 C.F.R., Part 404, Subpt. P, Appendix 2) establish that a person aged 18-44 with the ability to do sedentary work is not

disabled regardless of prior work experience or transferable skills. Indeed, such a person would not be disabled even if he or she had no prior work experience at all and were unable to communicate in English. See, Appendix 2, Rule 201.100(h)(2). Mr. Giroux was born in 1972, has a GED, speaks English, and has prior work experience at the skilled level. It was not error to conclude that he could perform jobs at the semi-skilled level.

### Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, this Court recommends that the final decision of the Commissioner of Social Security, finding that plaintiff Matthew A. Giroux is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **September 12, 2011.**

**Submitted: August 26, 2011.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**